[Cite as *Marden Rehab. Servs., Inc. v. E. Liverpool Convalescent Ctr., Inc.*, 2011-Ohio-6638.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| MARDEN REHABILITATION<br>SERVICES, INC., | ) | CASE NO.  10 CO 24 |
| | ) | |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| EAST LIVERPOOL CONVALESCENT<br>CENTER, INC., dba ADKINS<br>CARE CENTER, | ) | |
| | ) | |
| | ) | |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Common Pleas
Court, Case No. 09 CV 130.

JUDGMENT:                                      Affirmed.

APPEARANCES:
For Plaintiff-Appellant                      Attorney Sebastian E. Proels
Attorney Michael T. Winschel
Proels Winschel LLC
23811 Chagrin Blvd., Suite 325
Beachwood, OH  44122

For Defendant-Appellee:                  Attorney Timothy R. Brookes
631 Broadway
P.O. Box 15
East Liverpool, OH  43920

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

Dated: December 16, 2011

[Cite as *Marden Rehab. Servs., Inc. v. E. Liverpool Convalescent Ctr., Inc.*, 2011-Ohio-6638.]
DeGenaro, J.

{¶1}   Plaintiff-Appellant, Marden Rehabilitation Services, Inc. appeals the decision of the Columbiana Court of Common Pleas in favor of Defendant-Appellee, E. Liverpool Convalescent Center Inc. dba Adkins Care Center.  The trial court found Marden was equitably estopped from prevailing on its breach of contract claim.  Marden argues that the trial court incorrectly applied the elements of equitable estoppel and that the statute of frauds prevents the application of equitable estoppel.  Marden also argues, in the alternative, that if equitable estoppel is proper, it is entitled to $5,000 in attorney fees. Marden's arguments are meritless.

{¶2}   First, the doctrine of equitable estoppel bars Marden's breach of contract claim against Adkins.  As part of its proposal to settle the dispute, Marden indicated that all agreements to provide therapy services to Adkins' patients would terminate on a date certain.  The trial court correctly concluded that Adkins reasonably relied upon Marden's representation when it contracted with a third party to provide therapy services to its patients.  Thus, it would be inequitable to award Marden damages for lost income for the time left on the contract.  Further, the statute of frauds does not prevent Adkins from asserting the defense of equitable estoppel.  Finally, because there was never a contractual agreement between the parties for Adkins to pay Marden attorney fees, the trial court properly rejected that claim because equitable estoppel does not create a contract; rather, it is an equitable defense to preclude recovery pursuant to an otherwise valid contract.  Accordingly, the trial court's July 13, 2010 and September 8, 2010 decisions are affirmed.

## Facts and Procedural History

{¶3}   In 2004, Marden contracted with Adkins to provide rehabilitation therapy services to two Adkins nursing home facilities, and delineated the procedure for how Marden was to bill for its services, and how Adkins was to pay those invoices.  The starting date for the initial two-year term of the contract commenced on two dates in mid-May 2005, when Adkins obtained appropriate licensure and Marden could then begin treating Adkins patients.  The contract also provided that after the initial contract period, the contract automatically renewed for successive one-year terms on the anniversary

dates of the commencement of services, unless terminated in accordance with the terms of the contract. Although the contract set forth options available to the non-breaching party in the event of default or breach, there was no provision for voluntary termination by either party to prevent the automatic one year renewal. Thus, the parties appear to be bound to a 'non-cancelable contract,' as characterized by Marden in its amended complaint. Neither party challenged the legality of this term of the contract, nor did the trial court address it in any fashion.

{¶4} In 2008 and early 2009 Adkins was behind in its payments to Marden. Marden sent several notices to Adkins, informing Adkins of the substantial arrearage it was accumulating, and threatened legal action if the breach was not cured. On February 4, 2009, Marden filed a complaint for breach of contract seeking $259,330.98 in damages. But by April 2009, the parties entered into settlement discussions, and Adkins had paid over $150,000.00 towards the arrearage.

{¶5} On May 27, 2009, Marden's attorney e-mailed Adkins' attorney a list of settlement terms Marden agreed to, which included in pertinent part: " * * * 2. All agreements for the provision of services are terminated at 5PM on June 30, 2009; * * * 8. Marden will remove all of its equipment and records by the close of business on June 30, 2009; * * * 9. Marden will note in all patient charts that our under arrangement [sic] services has terminated and continuing responsibility is with the Provider (Adkins); *** 10. Adkins by August 15, 2009 will remit the sum of $5,000.00 to Marden in consideration of attorney fees incurred; and 11. This offer is good until noon tomorrow (5-28-09) after which time it *may* be withdrawn [.]" (emphasis added) Adkins did not reply in writing to this email on May 28th. Adkins' administrator did testify that through his managerial responsibilities for Adkins he had the impression that Marden and Adkins were agreeing to terminate the Agreements. Adkins' owner and acting president also testified that she received verbal notice that Marden was terminating the Agreements. It is not clear when these conversations occurred.

{¶6} On June 4, 2009, Adkins entered into an agreement for therapy services with Blue Sky Therapy. On June 5, 2009, Adkins made a payment of $215,000 to

eliminate the arrearage through the parties' attorneys. Counsel also continued with settlement discussions.

{¶7} On June 15, 2009, Marden's CEO Randall Mason contacted his attorney regarding the lack of an executed settlement agreement and in an e-mail alleged that Adkins was not abiding by the non-solicitation clause in the parties' 2004 contract.

{¶8} In a June 16, 2009 fax to Adkins' attorney, Marden's attorney stated that unless he received a signed settlement agreement by June 18, 2009, that the offer was rescinded. On June 17, 2009 Adkins's attorney faxed an unsigned settlement agreement to Marden's attorney, with slightly different terms that had been proposed by Marden. On June 17 and 18, 2009 Mason provided comments directly to Adkins's attorney concerning the settlement agreement's terms.

{¶9} On June 19, 2009, Adkins' attorney faxed Marden's attorney a signed copy of the negotiated settlement agreement, with terms pursuant to the parties' discussions, a cognovit promissory note from Janice L Bowden (acting President and owner of Adkins) personally guaranteeing the payment for the May, June, and July invoices, and a copy of a letter Adkins sent to Blue Sky instructing Blue Sky not to solicit Marden's employees. This settlement agreement contained substantially the same terms as had been contained in Marden's May 27, 2009 offer, except that the termination date was now July 10, 2009, instead of June 30th. This agreement still provided that Marden's services terminated, its equipment and records would be removed from the Adkins facilities on that date, and patients' charts noted that Adkins was now responsible for therapy services. This negotiated settlement agreement also provided that Adkins would pay Marden a $5,000 early termination fee; there was no reference to attorney fees. Finally, the non-solicitation clause in the parties' 2004 contract would survive the termination, and Adkins must notify any vendors that the non-solicitation clause was in effect between Adkins and Marden.

{¶10} On June 24, 2009, Marden sent a letter to Adkins asserting Adkins was in continued breach of the non-solicitation clause contained in the parties' 2004 contract. Marden further stated Adkins prematurely announced a settlement between the parties

and that Marden considered the parties' 2004 contract to be in full force, concluding it remained "willing to discuss a settlement with Adkins following either receipt of a cancellation notice or written affirmation that Adkins will honor the existing Agreement term."

{¶11} In a July 6, 2009 fax to Marden's attorney, Adkins's attorney stated that Adkins "had continued to comply with the terms of the Settlement Agreement which was revised numerous times to meet the demands of Marden." Adkins stated that pursuant to their "previous agreement" it was attaching two checks totaling $31,678.58 but refused to comply with any additional terms until it received a counter-signed copy of the settlement agreement from Marden. The faxed communication also stated that Marden's employees would not be allowed to enter Adkins' facilities after July 10, 2009.

{¶12} From July to November 2009, Adkins paid Marden the remainder of the amount owed pursuant to the proposed settlement agreement, excepting the $5,000 early termination fee.

{¶13} On January 21, 2010, Marden filed its First Amended Complaint alleging the outstanding invoices had been paid during the litigation, as well as setting forth the terms of the May 27, 2009 settlement proposal. However Marden was now seeking damages for breach of contract for the balance of fees that would have been earned during the remainder of the automatic one year renewal period from July 11, 2009, the date Marden voluntarily ceased providing therapy services, to May, 2010. During the one day bench trial and in post-trial briefs, Marden argued that there was not a valid settlement agreement with Adkins and that because the 2004 contract was effective until May 17, 2010, that Adkins owed Marden for the remainder of the contract term. Adkins countered with the affirmative defenses of accord and satisfaction and promissory estoppel, arguing it was inequitable to enforce the contract when Adkins relied on the much negotiated settlement agreement and acted accordingly, specifically hiring Blue Sky to provide therapy services because Marden was terminating services. Again, neither party challenged the validity of the 2004 contract.

{¶14} On July 13, 2010, the trial court issued an "Announcement of Decision"

finding Marden was equitably estopped from claiming breach of contract as pled in the Amended Complaint for damages through the end of the one year renewal period, because "Adkins relied on the proposed and negotiated Settlement Agreement, which included all the provisions which Marden had requested, when Adkins hired Blue Sky as the successor to Marden." The trial court also found that Adkins had a right to rely on the settlement negotiations, and that Marden used the "baseless allegation of solicitation to justify its refusal to sign the negotiated Settlement Agreement as a ruse to sue for damages covering the remainder of the contract period." The court reserved for a later date a finding on the settlement agreement's provision concerning payment of attorney fees.

{¶15} On July 23, 2010, Marden filed a notice of appeal, which was held in abeyance until the trial court entered judgment on attorney fees. On September 8, 2010, the trial court found it was inequitable to require to Adkins to pay $5,000 to Marden when Marden had led Adkins "to believe the matter had been settled" and then filed its First Amended Complaint. Upon entry of the second judgment, this court had jurisdiction to proceed with the appeal. R.C. 2505.02, App.R. 4.

## Equitable Estoppel

{¶16} In its sole assignment of error, Marden asserts:

{¶17} "The trial court erred in granting judgment in favor of Defendant/Appellee finding that Plaintiff/Appellant's Actions for breach of contract was barred by the doctrine of equitable estoppel."

{¶18} Marden asserts that the trial court improperly applied the elements of equitable estoppel when it found Marden could not prevail on its breach of contract claim. Specifically, Marden argues that an overall lack of evidence and the timeline of events demonstrate that it never made a misleading factual misrepresentation upon which Adkins could have detrimentally relied. Adkins counters that the trial court properly applied the elements of equitable estoppel, and that this Court should defer to the trial court's ruling because the case turns on factual determinations and credibility issues.

{¶19} This Court applies an abuse of discretion standard when reviewing a trial

court's decision finding a breach of contract claim is barred by equitable estoppel. *Campbell v. Campbell* 3d Dist. No. 1-04-11, 2004-Ohio-4294 at ¶13, citing *Payne v. Cartee* (1996), 111 Ohio App.3d 580, 589, 676 N.E.2d 946. When reviewing a trial court's decision for an abuse of discretion, we cannot simply substitute our judgment for that of the trial court. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

**{¶20}** "The defense of equitable estoppel applies when a party prosecuting a claim for relief has induced the adverse party to believe that certain facts exist and the adverse party changed his position in reasonable reliance thereon, to his detriment." *Sky Bank-Ohio Bank Region v. Sabbagh*, 161 Ohio App. 3d 133, 2005-Ohio-2517, 829 N.E.2d 743, at ¶10, citing *Ensel v. Levy* (1889), 46 Ohio St. 255, 19 N.E. 597. Equitable estoppel is a flexible doctrine that "must be determined on the particular facts of each case." *In re Election of Nov. 6, 1990 for Office of Atty. Gen. of Ohio* (1991), 58 Ohio St.3d 103, 114, 569 N.E.2d 447. Courts use equitable estoppel "to prevent results contrary to good conscience and fair dealing." *Lewis & Michael Moving & Storage, Inc. v. Stofcheck Ambulance Serv., Inc.*, 10th Dist. No. 05AP-662, 2006-Ohio-3810, at ¶34, quoting *Markese v. Ellis* (1967), 11 Ohio App.2d 160, 163, 229 N.E.2d 70. The doctrine does not create a new right or cause of action; it prevents a party from raising a claim it otherwise could have. *See Callander v. Callander*, 10th Dist. No. 07AP-746, 2008-Ohio-2305 at ¶31.

**{¶21}** A prima facie case for equitable estoppel requires a party to prove: (1) that the adverse party made a factual misrepresentation; (2) that it is misleading; (3) that it induced actual reliance which is reasonable and in good faith; and (4) that the reliance caused detriment to the relying party. See *Helman v. EPL Prolong, Inc.* (2000), 139 Ohio App.3d 231, 246, 743 N.E.2d 484 (Seventh District); *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369, 379, 607 N.E.2d 492. "[T]he party asserting estoppel must either lack knowledge of the relevant facts or at least have a lesser knowledge than

the party to be estopped." *Heskett v. Paulig* (1999), 131 Ohio App.3d 221, 227, 722 N.E.2d 142. Thus, "the party claiming estoppel is required to use reasonable diligence to obtain knowledge of the relevant facts." Id. (citations omitted). We will review each element in turn.

**{¶22}** Marden asserts that it never made a factual misrepresentation, specifically, that it was going to terminate the Agreement. Marden argues that it never stated that the "settlement was final" and that negotiations were ongoing when it decided not to settle. Marden further claims it did not mislead Adkins into believing Marden was willing to settle when it never intended to, or that it used solicitation of Marden employees by Blue Sky as an excuse not to settle. Instead, Marden argues it represented to Adkins that it was open to negotiating a settlement, which could include terminating the parties' 2004 contract. However, there is evidence in the record to support a finding that Marden indicated it was going to settle and terminate the parties' 2004 contract when it in fact had no intention of doing so.

**{¶23}** The May 27, 2009 settlement proposed by Mason on behalf of Marden, which, significantly, is quoted in Marden's First Amended Complaint as well as attached as an exhibit, provides that: "2. All agreements for the provision of services are terminated at 5PM on June 30, 2009; * * * 8. Marden will remove all of its equipment and records by the close of business on June 30, 2009; * * * 9. Marden will note in all patient charts that our under arrangement [sic] services has terminated and continuing responsibility is with the Provider (Adkins);" This admission of fact by Marden is significant. "The Ohio Supreme Court has upheld the notion of judicial admissions through pleadings: '[A] party who has alleged and has the burden of proving a material fact need not offer any evidence to prove that fact if it is judicially admitted by the pleadings of the adverse party.' *Gerrick v. Gorsuch* (1961), 172 Ohio St. 417, 178 N.E.2d 140. Intermediate appellate courts have acknowledged this principle. As the Ninth Appellate District has explained, 'It is the general rule that a statement of fact by a party in his pleading is an admission that the fact exists as stated, and, as such, is admissible against him in favor of his adversary.' *Teagle v. Lint* (Apr. 1, 1998), 9th Dist. No. 18425.

Therefore, as long as the statement of fact in the complaint is distinct and unequivocal, it can be accepted as a judicial admission in that case. Id.; see, also, *Dombelek v. Ohio Bur. of Workers' Comp.*, 154 Ohio App.3d 338, 2003-Ohio-5151, 797 N.E.2d 144, at ¶22." *Haney v. Law*, 1st Dist No. C-070313, 2008-Ohio-1843, at ¶8.

{¶24} Further, Adkins' administrator testified that Adkins would not have contracted with Blue Sky absent an understanding from Marden that the parties were agreeing to terminate their agreements. Bowden also testified that when she authorized Adkins to contract with Blue Sky it was her understanding that the parties had agreed to terminate the 2004 contract, and had received verbal notice that Marden would be terminating services.

{¶25} The trial court found that Marden made a factual misrepresentation to Adkins that it would settle, that Marden never intended to settle, and misled Adkins when it indicated it was willing to do so. The trial court based these findings upon credibility determinations it made regarding all the witnesses. Because this court is not in a position to observe the demeanor of the witnesses, we must defer to the trial court's credibility determinations. Significantly, Marden admitted in its Amended Complaint that on May 27 that it stated to Adkins that the agreement to provide services to Adkins terminated on June 30, Marden's equipment and records would be removed on that date and the patients' charts noted that thereafter Adkins was responsible for providing therapy services. Thus, the trial court did not abuse its discretion in determining that Marden made a factual misrepresentation and misled Adkins.

{¶26} The minority contends that our use of the settlement agreement "nullifies Evid.R. 408." While Evid.R. 408 prohibits the admission of settlement proposals "to prove liability for or invalidity of the claim or its amount," the rule does not require exclusion when evidence of a settlement is offered for other purposes. Evid.R. 408. Here the settlement proposal is not used to establish or negate liability, but rather to show those terms to which Marden agreed, including that it would terminate its service contract on June 30, 2009. Moreover, this is not the only evidence of Marden's factual misrepresentation. As discussed, Adkins' administrator testified it was her understanding

that Marden had agreed to terminate services; and Adkins' owner and acting president testified she had received verbal notice that Marden was terminating the Agreements. The trial court's determination that Marden made a factual misrepresentation is therefore supported by competent, credible evidence.

{¶27} Marden next argues that given the timeline of events, Adkins could not have relied on Marden's actions when it contracted with Blue Sky because the parties had not yet entered into serious settlement negotiations. Adkins does not specifically respond to this argument.

{¶28} In order for a court to find reliance for equitable estoppel purposes, the reliance must have been reasonable. *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630. A party cannot claim the benefit of an estoppel from words or conduct that did not come to his knowledge until after he had finally acted or taken his position. See 42 Ohio Jurisprudence 3d (2011) Estoppel and Waiver, Section 62, citing *Joseph Turk Mfg. Co. v. Singer Steel Co.* (N.D.Ohio 1951), 111 F. Supp. 485; *Martin v. Steinke* (1925), 22 Ohio App. 156, 154 N.E. 47.

{¶29} The trial court explicitly found Adkins relied on Marden's conduct: "The evidence is clear that Adkins relied on the proposed and negotiated Settlement Agreement, which included all the provisions which Marden had requested, when Adkins hired Blue Sky as the successor to Marden." But Marden correctly points out that the trial court based its finding that the reliance element had been met upon facts and circumstances which occurred after June 4, 2009, the date Adkins contracted with Blue Sky. Thus, the trial court's finding of reliance based on facts subsequent to June 4 was erroneous.

{¶30} However, the court of appeals must affirm a trial court's judgment if it is legally correct on other grounds, because such error is not prejudicial. *Reynolds v. Budzik* (1999), 134 Ohio App. 3d 844, 846, 732 N.E.2d 485, fn. 3, citing *Newcomb v. Dredge* (1957), 105 Ohio App. 417, 424, 6 O.O.2d 178, 152 N.E.2d 801; *State v. Payton* (1997), 124 Ohio App.3d 552, 557, 706 N.E.2d 842. "It has long been the law in Ohio that where the judgment is correct, a reviewing court is not authorized to reverse such

judgment merely because erroneous reasons were assigned as the basis thereof." *Reynolds*, at fn. 3, (citations omitted).

**{¶31}** The record contains evidence of Marden's conduct before June 4th, which Adkins relied on before it decided to contract with Blue Sky. First, settlement discussions between the two parties began in April 2009. Second, Adkins' administrator and owner testified that Adkins would not have signed a new contract with Blue Sky but for Marden's representations concerning terminating services. Finally, Marden stated in its Amended Complaint that the May 27, 2009 email sent to Adkins' counsel stated that the parties' 2004 contract terminated June 30, 2009, Marden would remove its equipment and records that day, and would note in each patient's chart that thereafter Adkins was responsible for providing therapy services. Thus, Marden admitted that before June 4 it told Adkins the agreements to provide services terminated June 30th. *Gerrick*, *Teagle*, *Haney*. Therefore, the trial court's error of relying on evidence after June 4 to support its finding that the reliance element was met is harmless.

**{¶32}** The next issue is whether Adkins' reliance was reasonable. As a matter of law the statements made in Marden's May 27 email and those made in the parties' settlement discussions starting in April through June 3, 2009 are the only statements that can be relied upon. The narrow question for us is whether it was reasonable for Adkins to rely upon those statements when it entered into the contract with Blue Sky on June 4. A review of the May 27 email reveals that Marden was unequivocal regarding the pertinent issue in this case: termination of its services. June 30, 2009 was: the termination date of the parties' 2004 contract; the date each party released the other from any further obligations under the contract, except for the non-solicitation clause and for "continuing payment obligations incurred by Adkins to Marden for May 2009 and June 2009;" and, the date all Marden equipment and records would be removed and patients' charts noted that thereafter Adkins was responsible for providing therapy services. This left Adkins with the reasonable impression that it had thirty days to find another company to provide therapy services for its patients.

**{¶33}** The fact that Adkins did not respond to the email by noon on May 28th has

little impact on this analysis, primarily because Marden's email stated that the offer *may* be withdrawn. Moreover, had Adkins accepted on that date, the doctrine of equitable estoppel would be inapplicable. Rather, had both parties signed the settlement agreement and not just Adkins, an enforceable contract would have been created and subject to enforcement. On the other hand, had Adkins verbally accepted the May 27 email but one or both parties did not sign a settlement agreement, the doctrine of *promissory estoppel* would have applied to enforce the terms of the May 27 email. But as the trial court correctly found, that doctrine does not apply here because there was not an unambiguous promise by Marden to Adkins. If that had been the case, *Marden could have used promissory estoppel as a sword* to require Adkins to pay damages pursuant to that May 27 email. Here, *Adkins properly used equitable estoppel as a shield* to prevent Marden from collecting damages for breach of the 2004 contract.

{¶34} Finally, courts have considerable discretion in fashioning equitable remedies. See, e.g., *Allason v. Gailey*, 189 Ohio App.3d 491, 2010-Ohio-4952, 939 N.E.2d 206. Thus, we are mindful that our standard of review is an abuse of discretion. Marden admitted that it made those statements to Adkins on May 27. Adkins personnel testified that they would not have signed a contract with Blue Sky but for the relationship with Marden being terminated. The trial court made a credibility determination as the trier of fact that the witnesses for Adkins were more credible. Thus, the trial court did not abuse its discretion when it found that it was reasonable for Adkins to rely upon the statements Marden made in the May 27 email, and enter into a contract on June 4 with Blue Sky to provide therapy services.

{¶35} Marden finally argues that there is no evidence that Adkins suffered any detriment because of Marden's behavior; because there was no reliance, there can be no detriment. The trial court did not abuse its discretion when it found: "when Adkins hired Blue Sky as the successor to Marden * * * Adkins was in the untenable position of having signed a new contract with Blue Sky." The detriment to Adkins is that, because of Marden's conduct, specifically, misrepresenting to Adkins that it was terminating services on June 30, and Adkins reasonably relying upon those representations, Adkins was

contractually obligated to two parties for therapy services from July 10 through May 17, 2010.

**{¶36}** The parties agreed, as characterized by Marden, to enter into a 'non-cancellable contract',' the legality of which is suspect, but an issue we cannot address; because it was raised neither with the trial court nor this court, and thus it is waived. Had Adkins accepted the terms of Marden's May 27th email, we would either be reviewing an executed, enforceable contract, or applying the doctrine of promissory estoppel because the parties exchanged unambiguous promises that are enforceable. But we have been presented with neither situation. Instead, Adkins is seeking equitable relief, "to prevent results contrary to good conscience and fair dealing." *Lewis & Michael Moving & Storage, Inc.*, at ¶34. By asserting this defense, Adkins is conceding it has breached the contract with Marden, and asks this court to prevent Marden from raising a claim it otherwise could have. *Callander* at ¶31.

**{¶37}** Regardless of how inartfully the 2004 contract was drafted, the record reveals that the parties intended to terminate their contract. It bears repeating that the Ohio Supreme Court has held equitable estoppel is a *flexible* doctrine that "must be determined on the particular facts of each case." *In re Election of Nov. 6, 1990 for Office of Atty. Gen. of Ohio*, at *114, and made for cases such as this. When a legal remedy is impossible or incomplete, courts may look to equity to fashion a remedy. It is a long-standing maxim that "equity regards and treats that as done which in good conscience ought to be done[.]" *Geiger v. Bitzer* (1909), 80 Ohio St. 65, 73-74, 88 N.E. 134.

**{¶38}** Given the facts of this case, the parties' dispute cannot be resolved using conventional theories of contract. We disagree with the minority that the settlement agreement constitutes an enforceable contract; thus the only way to resolve this dispute is to apply equity. Adkins breached the 2004 contract by failing to timely pay Marden for its services, which resulted in the instant lawsuit. After the lawsuit was filed, the parties began negotiating the dispute, and Marden told Adkins it would terminate services June 30, 2009. As a result of this statement, Adkins found another company to provide therapy services. Adkins is now asking that, out of a sense of fairness and fair dealing, that

Marden be prohibited from collecting damages for July 11, 2009 through May 17, 2010. Because the record demonstrates that all the elements were met, the trial court properly found that Marden's claim for breach of the 2004 contract was barred by equitable estoppel. Thus, Marden's arguments to the contrary are meritless.

### Statute of Frauds

**{¶39}** Marden also argues that allowing the defense of equitable estoppel would undermine the purpose of the statute of frauds. Adkins counters that the cases Marden cites are distinguishable because Marden never stated that the drafts of the settlement it was sending were for "discussion purposes only."

**{¶40}** Marden's reliance upon *Olympic Holding Co., L.L.C. v. Ace Ltd.*, 122 Ohio St. 3d 89, 2009-Ohio-2057, 909 N.E.2d 93, for the proposition that the statute of frauds prevents the application of equitable estoppel is misplaced because that case involved promissory estoppel. However, Marden argues that, like promissory estoppel, equitable estoppel should not bar the application of the statute of frauds. But unlike promissory estoppel, equitable estoppel does not create a cause of action; instead "it precludes a person from denying his own acts or admissions that were expressly designed to influence the conduct of another, and did so influence such conduct, when such a denial will operate to injure another." *Kessler v. Totus Tuus L.L.C.*, 185 Ohio App.3d 240, 2009-Ohio-6376, 923 N.E.2d 1160, at ¶15. The trial court did not enforce the negotiated settlement agreement, it estopped Marden from claiming breach of the 2004 contract for the additional contract year. In fact, Adkins argued in its post-trial brief that promissory estoppel applied, and the trial court correctly rejected this argument; it specifically found that promissory estoppel did not apply here because there was no evidence of a definite promise by Marden to Adkins. The trial court correctly found that equitable estoppel applied, and barred Marden from recovering damages for the balance of the automatic renewal year pursuant to the parties' 2004 contract. Equitable estoppel was used in this case defensively to prevent Marden from prevailing on its breach of contract claim based upon the 2004 contract. The trial court did not use promissory estoppel to enforce a settlement agreement, because none existed. Thus, the Statute of Frauds does not

apply, and Marden's argument is meritless.

## Attorney Fees

**{¶41}** Marden alternatively argues that if this Court finds that the trial court properly applied equitable estoppel, then the trial court should have awarded it $5,000 for attorney's fees, which it asserts was a term in the proposed settlement agreement.

**{¶42}** Had the parties actually executed a settlement agreement, Marden's argument would be meritorious. "Under Ohio law, contractual provisions awarding attorney fees are enforceable and not void as against public policy so long as the fees awarded are fair, just, and reasonable as determined by the trial court upon full consideration of all the circumstances of the case. *Northwoods Condominium Owners' Assn. v. Arnold*, 147 Ohio App.3d 343, 2002-Ohio-41, 770 N.E.2d 627, at ¶16, citing *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 514 N.E.2d 702; *Gaul v. Olympia Fitness Ctr.* (1993), 88 Ohio App.3d 310, 623 N.E.2d 1281.

**{¶43}** However, there is no binding contract providing for fees in this case. The trial court ruled that based upon Marden's conduct during the settlement negotiations, Marden was equitably estopped from pursuing the additional contract damages it alleged in its Amended Complaint. Contrary to Marden's assertions, this ruling does not have the effect of transforming the proposed settlement agreement into a binding contract.

**{¶44}** Given the absence of a contractual obligation, there was no basis for an attorney fee award. Accordingly the trial court's decision not to award Marden attorney fees was proper.

**{¶45}** In sum, Marden's assignment of error is meritless. The doctrine of equitable estoppel bars Marden's breach of contract claim against Adkins, and any error committed by the trial court in its application of the doctrine is harmless. Further, the statute of frauds does not prevent Adkins from asserting the defense of equitable estoppel. Finally, because there was never a contractual agreement between the parties for Adkins to pay Marden attorney fees, the trial court properly rejected that claim. Equitable estoppel does not create a contract; rather, it is an equitable defense to preclude recovery pursuant to an otherwise valid contract. Accordingly, the trial court's July 13, 2010 and September 8,

2010 judgments are affirmed.

Waite, P.J., concurs in judgment only with concurring opinion.

Vukovich, J., concurs in judgment only.

Waite, P.J., concurring in judgment only.

{¶46} I agree with the majority that the judgment of the trial court should be affirmed, but I have considerable disagreement with the reasoning used and with the implications of that reasoning for future cases. In my review of the record I find that the parties entered into an enforceable settlement. The main purposes of this settlement were to terminate the 2004 contract between Appellant Marden Rehabilitation Services Inc. ("Marden") and Appellee East Liverpool Convalescent Center, Inc. dba Adkins Care Centers ("Adkins"), and pay arrearages owed on the contract. The record contains a number of offers and counteroffers by both parties, culminating in a written agreement signed and returned by Adkins on June 19, 2009. The agreement contained all the provisions proposed by Marden and was signed by the party to be charged, i.e., Adkins. Due to the fact that there is an enforceable settlement agreement in the record, it is inaccurate to rely on the doctrine of equitable estoppel.

{¶47} Because of the convoluted nature of the parties' dealings, I can initially see that a question might exist regarding the enforceability of the June 19, 2009, settlement due to a possible statute of frauds problem. The statute of frauds is codified in R.C. Chapter 1335. One of the divisions of the statute of frauds involves agreements that cannot be performed within one year. R.C. 1335.05. To be enforceable, an agreement

that cannot be performed within one year must be in writing and signed by the party "to be charged therewith". In this case, the June 19, 2009, settlement is a writing that contains all the provisions of Marden's counteroffer, and is signed only by Janice Bowden both as vice president of Adkins and in an individual capacity. Under the usual rules of contract interpretation, this document satisfies the requirements of being a contract: offer, acceptance, mutual assent to the terms, consideration, legal subject matter, legal capacity. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶16. The existence of the signatures of both of the parties helps clearly establish assent to the terms, but is not completely determinative of whether or not a contract exists. 17 Ohio Jurisprudence Contracts Section 72. Signatures are important in a statute of frauds analysis, though. The June 19, 2009, settlement is not signed by any representative from Marden, which may raise a question as to whether it can be enforced against Marden if it falls under the requirements of the statute of frauds.

**{¶48}** The "not to be performed within one year" provision of the statute of frauds is interpreted very narrowly: "For over a century, the 'not to be performed within one year' provision of the Statute of Frauds, in Ohio and elsewhere, has been given a literal and narrow construction. The provision applies only to agreements which, by their terms, cannot be fully performed within a year; and not to agreements which may possibly be performed within a year." *Sherman v. Haines* (1995), 73 Ohio St.3d 125, 127, 652 N.E.2d 698.

**{¶49}** Thus, bearing this in mind, the statute of frauds does not appear to apply to either the 2004 contract or the 2009 settlement agreement. Both contained a non-

compete clause (section 12) that lasted for one year after the contract terminated. Appellant interprets that the non-compete clause serves as a trigger for the statute of frauds. I disagree with this interpretation. The 2004 contract contains provisions that could terminate the contract immediately (section 8), even as early as the date on which the contract was executed. If this occurred, then the one-year non-compete clause would be immediately triggered, thus enabling the contract to be performed within one year and taking it out of the realm of the statute of frauds. The one-year non-compete clause in the 2009 settlement agreement was triggered when Adkins' signed and returned the agreement. Without question, it would also be performed within one year.

{¶50} Even if the statute of frauds was construed to apply to one or both agreements, "[i]t is well established in Ohio that courts of equity may bar application of the statute of frauds." *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 623, 622 N.E.2d 1093. This approach has been taken by the majority with respect to the statute of frauds issue, and to that extent I agree with the majority.

{¶51} My primary disagreement with the majority opinion is in its use of a proposed settlement agreement to establish the facts necessary to support equitable estoppel. The majority uses the doctrine of judicial admissions to treat the terms of the May 27, 2009, proposed settlement as though they were established facts. The majority has determined that the terms of the proposed settlement become factual admissions because Appellant attached this settlement offer to its amended complaint. The one term of the proposed settlement that particularly stands out is that, under the proposal, all prior

agreements for the provision of services would be terminated on June 30, 2009. The majority adopts this provision as a factual admission by Marden that the 2004 contract was terminated on June 30, 3009. I disagree with the use of the concept of judicial admissions as applied to this document. If we hold, as the majority urges, that proposed settlement terms can be later used as factual admissions, this action would dramatically alter how settlement negotiations take place in this appellate district and elsewhere. No party to a dispute, contractual or otherwise, would put into writing a possible settlement agreement or proposed term of settlement if he or she was aware that this mere settlement proposal was subject to later use as an established fact. The majority's approach also nullifies Evid.R. 408, which prohibits the admission of evidence of settlement proposals, along with evidence of any statements or conduct taking placing during settlement, for the purpose of proving the validity or invalidity of a claim. A proposed term of settlement is just that: a proposal, not a fact. The attachment of the settlement proposal to the amended complaint might be an admission that the parties were involved in settlement negotiations, but that is the extent of its usefulness.

**{¶52}** If the statute of frauds is not a factor in this case, and I do not believe that it is, then the following evidence in the record establishes that the June 19, 2009, settlement is a valid contract that served to terminate the 2004 contract:

**{¶53}** a. On 9/23/04 the first contract is executed. It terminates on May 17, 2005, for Adkins' building 1, and May 19, 2005, for Adkins' building 2.

**{¶54}** b. Adkins was behind in its payments in 2008 and early 2009.

**{¶55}** c. Marden threatens legal action if arrearage is not paid.

**{¶56}** d. Marden files lawsuit on February 4, 2009.

**{¶57}** e. Parties enter into settlement negotiations.

**{¶58}** f. May 27, 2009, Marden sends a written settlement offer in an email to Adkins.  The settlement may be withdrawn at 12:01pm on May 28, 2009.  There is no indication that it is withdrawn.

**{¶59}** g. June 16, 2009, Marden extends the settlement offer to June 18, 2009.

**{¶60}** h. June 17, 2009, Adkins delivers a counteroffer to Marden that incorporates the May 27, 2009, settlement terms.

**{¶61}** i. June 17, 2009, Marden responds to Adkins' counteroffer by faxing a new counteroffer to Adkins with a few additional terms.  No time limit is placed on this counteroffer.

**{¶62}** j. June 18, 2009, Marden faxes yet an additional counteroffer by adding a few more terms to the June 17, 2009, counteroffer.  No time limit is placed on this counteroffer.

**{¶63}** k. June 19, 2009, Adkins faxes the signed counteroffer to Marden, with all the corrections requested by Marden in its May 27th email along with the June 17th and 18th faxes.

**{¶64}** Based on this record, Marden made a counteroffer on June 18, 2009, there was no expiration date on the counteroffer, and Adkins accepted the counteroffer on June 19, 2009.  This Court should simply enforce the settlement as agreed to by the parties. One of the terms of the settlement was that Marden would dismiss its complaint.  This is what the trial court did, and thus, I would affirm the trial court's judgment.